# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

RANDY DISHMON,                          )
                                        )
      **Plaintiff,**                  )
                                        )
v.                                      )     **Case No. 2:07-cv-0079**
                                        )     **Judge Trauger**
WAL-MART STORES, INC.,                  )
                                        )
      **Defendant.**                  )

## MEMORANDUM

Pending before the court is the Defendant's Motion for Summary Judgment (Docket No. 29), to which the plaintiff has responded (Docket No. 36), and the defendant has replied (Docket No. 40). Also pending is the Defendant's Motion to Strike Portions of Plaintiff's Affidavit (Docket No. 38), to which the plaintiff has responded (Docket No. 41). For the reasons discussed herein, both the defendant's motion for summary judgment and its motion to strike will be denied.

## BACKGROUND

The plaintiff in this case, Randy Dishmon, is a licensed optician and was employed as a Vision Center Manager at a Wal-Mart store located in Cookville, Tennessee.[1] In that position, Mr. Dishmon was responsible for the day-to-day operations of the vision center, including

---

[1] Unless noted otherwise, the facts are drawn from Randy Dishmon's Response to Wal-Mart Stores East, L.P.'s Statement of Undisputed Material Facts. (Docket No. 37.) Although "Wal-Mart Stores, Inc." is named as the defendant in the caption, the defendant asserts that it has been "misidentified" and is properly known as "Wal-Mart Stores East, L.P." (Docket No. 30 at 1.) The plaintiff has not disputed this, and the defendant is referred to herein as "Wal-Mart."

Case 2:07-cv-00079   Document 45   Filed 02/17/09   Page 1 of 21 PageID #: 436

preparing and dispensing prescription optical products, such as glasses and contact lenses, and supervising both licensed opticians and unlicensed associates. Mr. Dishmon reported to a district manager; during the relevant time period, Rachael Creel first served in that position and then was succeeded by Robert Mason. During Mr. Dishmon's tenure, Robert Young served as a regional manager.

Mr. Dishmon's allegations arise out of his termination by Wal-Mart on October 9, 2006. According to Mr. Dishmon, prior to his termination, he had observed and complained about certain practices at Wal-Mart that, he asserts, violated Tennessee's law governing the dispensing of of optical products, as well as Wal-Mart's own relevant policy.[2] (*See* Docket No. 1 Ex. A.) Specifically, he asserts that he challenged Wal-Mart's practice of permitting unlicensed associates to dispense optical products without a licensed optician present.[3] (*Id.* ¶ 11.) Mr. Dishmon further claims to have challenged Wal-Mart's practice of hiring or promoting

---

[2]Tennessee law provides that anyone who dispenses prescription optical products without complying with the applicable licensing requirements commits a Class B misdemeanor. Tenn. Code. Ann. § 63-14-110. Additionally, the law provides:

> It is unlawful for any person to practice or offer to practice as a dispensing optician as an employee of any person not engaged primarily in the practice as dispensing optician as a licensee under this chapter, or of any firm or corporation not engaged primarily in the practice of dispensing opticians under the actual and personal supervision of partners, officers, managers or stockholders who possess valid unrevoked licenses as dispensing opticians entitled to practice within this state in accordance with the provisions of this chapter.

Tenn. Code Ann. § 63-14-103(d).

[3]Wal-Mart vision centers employ both licensed opticians and unlicensed associates. According to Wal-Mart's official policy, unlicensed associates are only permitted to dispense optical products if a licensed optician is present at the vision center.

2

unlicensed individuals to district and regional manager positions, rather than hiring or promoting licensed opticians such as himself.[4]  (*Id.*)  Mr. Dishmon alleges that he was terminated in retaliation for these complaints and that his termination violates Tennessee's statutory and common law protections for whistle-blowers.  (*Id.* ¶¶ 12-16.)  Wal-Mart, by contrast, casts Mr. Dishmon as the wrongdoer and asserts that he was terminated not because of his complaints, but rather because he permitted unlicensed associates to dispense without a licensed optician present. (Docket No. 30.)

## ANALYSIS

Wal-Mart has moved for summary judgment with respect to both Mr. Dishmon's claim arising under Tennessee statutory law and his claim arising under Tennessee common law.

## I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

---

[4]The Complaint also asserts that Wal-Mart violated the law by requiring licensed opticians to solicit business for optometrists.  (Docket No. 1 Ex. A ¶ 6.)  However, there is no evidence that Mr. Dishmon complained about this particular alleged violation nor that his retaliatory discharge claims are premised on any such complaints.

3

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

4

## II.     Retaliatory Discharge

Tennessee law provides protection for whistle-blowers by prohibiting retaliatory discharge under both statutory and common law.  First, the Tennessee Public Protection Act provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities."  Tenn. Code Ann. § 50-1-304(b).  To establish a *prima facie* violation of the statute, a plaintiff must demonstrate: "(1) his status as an employee of the defendant employer; (2) his refusal to participate in, or remain silent about, 'illegal activities' as defined under the Act; (3) his termination; and (4) an exclusive causal relationship between his refusal to participate in or remain silent about illegal activities and his termination."  *Franklin v. Swift Transp. Co.*, 210 S.W.3d 521, 528 (Tenn. Ct. App. 2006).  The statute defines "illegal activities" as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare."  Tenn. Code Ann. § 50-1-304(c).

Additionally, to establish a *prima facie* claim of retaliatory discharge under Tennessee common law, a plaintiff must demonstrate: "(1) that an employment-at-will relationship existed; (2) that he was discharged; (3) that the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge him was his exercise of protected rights or his compliance with clear public policy."  *Franklin*, 210 S.W.3d at 528 (citing *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn. 2002)).  The primary difference between a statutory claim and a common law claim is that the employee's actions must be the *exclusive*

5

*cause* of his or her termination to establish a statutory claim, whereas the employee's actions merely need to be a *substantial factor* in his or her termination to state a common law claim. *Collins v. AmSouth Bank*, 241 S.W.3d 879, 884 (Tenn. Ct. App. 2007) (citing *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 535-37 (Tenn. 2002)). Once a plaintiff has established a *prima facie* case of retaliatory discharge, the burden shifts to the employer to show a legitimate reason for the discharge. *Id.* at 885 (citing *Guy*, 79 S.W.3d at 534). If the employer does so, the burden shifts back to the plaintiff to demonstrate that this reason was, in fact, pretextual. *See Conley v. Yellow Freight Sys., Inc.*, 521 F. Supp. 2d 713, 730 (E.D. Tenn. 2007).

Here, Wal-Mart contends that Mr. Dishmon can establish neither a statutory nor a common law retaliatory discharge claim because he cannot establish that he refused to participate in or remain silent about any illegal activity and because he cannot establish that these actions were either the exclusive cause of, or a substantial reason for, his termination. Wal-Mart further contends that, even if Mr. Dishmon has established a *prima facie* case of retaliatory discharge, it had a legitimate, non-pretextual reason for terminating him. These arguments will be addressed in turn.

A.    *Refusal to Remain Silent*

Wal-Mart first argues that Mr. Dishmon cannot establish a genuine issue of material fact that he refused to participate in or remain silent about an illegal activity. (Docket No. 30 at 6-12.) Mr. Dishmon has acknowledged that, "out of fear [for his job]," he never refused to participate in an activity that he deemed illegal. (Docket No. 32 Ex. C at 71.) Instead, his claim is of the "refusal to remain silent" variety. To establish such a claim, a purported whistle-blower "need not report the suspected illegal activities directly to law or regulatory enforcement

6

officials" but "must make a report to some entity other than the person or persons who are engaging in the allegedly illegal activities." *Collins*, 241 S.W.3d at 885. Moreover, the purported whistle-blower's actions must "further an important public policy interest, rather than simply their personal interest." *Id.* Finally, "[s]imple disputes or arguments between employees and their supervisors regarding workplace procedures" are insufficient to establish either a statutory or a common law retaliatory discharge claim. *Id.* Wal-Mart asserts that Mr. Dishmon has failed to establish this element of his claims because he did not make any external complaints, because he merely questioned the legality of Wal-Mart's policies rather than protesting them, and because his complaints were motivated by the fact that he had not been promoted and, thus, did not implicate any public interest.

In support of its argument, Wal-Mart relies heavily on Mr. Dishmon's deposition testimony about the various supervisors and managers with whom he discussed his concerns. (Docket No. 30 at 8; *see* Docket No. 32 Ex. C at 40, 43-44, 46-47, 59-60, 75-77, 258-59.) Wal-Mart also notes that Mr. Dishmon testified that, "when I was complaining, I was more or less asking questions, rather than stating facts, because I didn't want it to appear that I was completely going against the grain so that I would get fired right away. I would say[,] [']is that legal?[']" (Docket No. 32 Ex. C at 259-60.) However, in addition to these internal conversations, Mr. Dishmon also made complaints external to Wal-Mart. On October 3, 2006, just days before he was terminated, Mr. Dishmon and Mark Partain, another vision center manager, telephoned the Tennessee Board of Dispensing Opticians (the "Board") to report that Wal-Mart was permitting unlicensed associates to dispense, a phone call of which Mr. Young, Mr. Dishmon's regional manager, was aware. (Docket No. 36, Dishmon Aff. ¶¶ 11-12; Docket

7

No. 36, Partain Aff. ¶¶ 2-3).[5]

[5]Wal-Mart has moved to strike these paragraphs of Mr. Dishmon's affidavit. (Docket No. 39 at 1-3.) These paragraphs state:

> On October 3, 2006 I attended a meeting of Vision Center store managers, District Managers and Regional Managers in Gallatin, Tennessee. During a break Mark Shane Partain and I telephoned the Tennessee Board of Dispensing Opticians to report that Wal-Mart was violating Tennessee law by allowing non-licensed employees to sell and dispense optical products. We also mentioned that Wal-Mart was employing non-licensed employees in upper management positions. . . . At this same meeting we advised other store managers that we had called the Tennessee Board of Dispensing Opticians. I specifically recall telling Jerry Wright of our call to the Tennessee Board of Dispensing Opticians. While telling Jerry Wright of our conversation with the Board, Robert Young approached us and eventually heard our conversation. He asked us about calling the Tennessee Board. We confirmed to him that we had called the Tennessee Board of Dispensing Opticians to report that Wal-Mart was violating Tennessee law by allowing non-licensed employees to sell and dispense optical products.

(Docket No. 36, Dishmon Aff. ¶¶ 11-12.) At the summary judgment stage, a post-deposition affidavit should be stricken or disregarded only if it "directly contradicts" prior sworn testimony or "constitutes an attempt to create a sham fact issue." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908-09 (6th Cir. 2006) (quotation and citation omitted). Wal-Mart asserts that, during his deposition, Mr. Dishmon testified that it was Mr. Partain who made the telephone call and that Mr. Dishmon simply listened to Mr. Partain's end of the call. (Docket No. 39 Ex. A at 133.) This is not, however, inconsistent with Mr. Dishmon's affidavit, which states that "Shane Partain and I telephoned the [Board]" (Docket No. 36, Dishmon Aff. ¶ 11), nor does the minor difference in phrasing reflect an attempt, on Mr. Dishmon's part, to create a factual issue. Wal-Mart further asserts that Mr. Dishmon testified that he and Mr. Partain "asked them about what these laws right here mean" (Docket No. 39 Ex. A at 134), in contrast to his affidavit, where he asserts that he and Mr. Partain "report[ed] that Wal-Mart was violating Tennessee law (Docket No. 36, Dishmon Aff. ¶ 11). Although there is a meaningful difference between asking and reporting, these activities are not necessarily mutually exclusive, and there is no reason to believe that Mr. Dishmon and Mr. Partain did not both ask about the meaning of the laws, consistent with Mr. Dishmon's deposition testimony, and report Wal-Mart's activities during the call, consistent with his affidavit, nor that this additional detail evidences an attempt to create a "sham fact issue." Finally, Wal-Mart asserts that Mr. Dishmon's statement in his affidavit that Mr. Young overheard Mr. Dishmon and Mr. Partain reporting on the telephone call and that they "confirmed to him that we had called the [Board] to report that Wal-Mart was violating Tennessee law" (*id.* ¶ 12) is inconsistent with Mr. Dishmon's deposition testimony that Mr. Young "overheard, I know he did, because he looked at us, and he just kept kind of hanging around there, listening, and so he knew we were—we had called the state and was asking about the laws, and so he could—I guess he foreseen that there was going to be problems with the law,

8

Subsequently, on October 6, 2006, Mr. Dishmon's attorney sent, on behalf of Mr. Dishmon and Mr. Partain, a letter to the Board reporting Wal-Mart's activities and requesting that the Board conduct an investigation. That letter states, in part:

> [I]t is a common practice during non-peak hours and on weekends for the Vision Center stores to employ non-licensed individuals to operate the stores. This practice is common as the store managers are pressured to lower payroll expenses to meet revenue expectations of the company. This practice is known by the supervisors of [Mr. Dishmon and Mr. Partain] identified as District and Regional Managers. Of equal concern is the practice of Wal-Mart, Inc. to hire and place as District and Regional Managers individuals who are not licensed as dispensing opticians.

(Docket No. 36, Dishmon Aff. Ex.) Mr. Dishmon's complaints can hardly be said to constitute a "simple dispute . . . regarding workplace procedures," but rather constituted an accusation that Wal-Mart's practices violated not only state law but also Wal-Mart's own stated policy. Mr. Dishmon has therefore established that, not only did he complain about Wal-Mart's practices, rather than merely inquiring about their legality, but also that he made those reports externally and that, at least with respect to the telephone call, Wal-Mart management was aware of those complaints.

Wal-Mart also asserts that Mr. Dishmon has not established that he refused to remain silent because his complaints were motivated by a private interest rather than a public interest. A retaliatory discharge claim is stated, "[s]o long as employees' actions are not merely private or

---

because we were questioning the law, we wanted to know what they was, and how it pertained to our business" (Docket No. 39 Ex. A at 135). Again, however, Mr. Dishmon's affidavit does not directly contradict his deposition testimony and does not evidence an attempt on Mr. Dishmon's part to manufacture a factual issue to survive Wal-Mart's motion for summary judgment. Moreover, the court notes that Mr. Partain has also submitted an affidavit that corroborates Mr. Dishmon's description of the telephone call and the conversation with Mr. Young. (Docket No. 36, Partain Aff. ¶¶ 2-3.) Therefore, even if Mr. Dishmon's affidavit were stricken, Wal-Mart would still have to contend with the issues raised by Mr. Partain's affidavit, which it has not moved to strike.

9

proprietary, but instead seek to further the public good." *Guy*, 79 S.W.3d at 538 n.4 (quotation, citation, and emphasis omitted). According to Wal-Mart, Mr. Dishmon was primarily concerned with the fact that he had not been promoted to a district manager position, as evidenced by his testimony that his complaints were "mostly that I wasn't getting promoted." (Docket No. 32 Ex. C at 87-88.) Wal-Mart further argues that, by the time he and Mr. Partain complained to the Board, Mr. Dishmon himself was under investigation by Wal-Mart for permitting unlicensed associates to dispense without a licensed optician present, and thus that his complaints were simply a last-ditch attempt to save his job. (Docket No. 40 at 4.) However, although Mr. Dishmon may indeed have had a private interest in refusing to remain silent with respect to Wal-Mart's actions, that was not his only motivation; rather, his complaints about not being promoted and his complaints about the legality of Wal-Mart's practices were simply two sides of the same coin. As he himself testified, "[a]s a licensed optician, I was not being promoted to district manager, and that's a roundabout way of saying its illegal for [a] nonlicense to be a district manager." (Docket No. 32 Ex. C at 88.)

Therefore, as he made external complaints to further a public interest, Mr. Dishmon has established this element of his retaliatory discharge claims.

10

*B.    Causation*

Wal-Mart next argues that Mr. Dishmon cannot establish that his complaints were either the exclusive cause of, or a substantial reason for, his termination.  (Docket No. 30 at 12-17.) Wal-Mart's argument essentially casts Mr. Dishmon, rather than itself, as the wrongdoer.

Approximately two years prior to his termination, Mr. Dishmon was disciplined by Wal-Mart for permitting unlicensed associates to dispense without a licensed optician present. (Docket No. 32 Ex. C at 126-28, Ex. 5.)  In addition, a few months prior to Mr. Dishmon's termination, a Wal-Mart regional compliance manager became aware that Chris Thurman, an optician who worked at Mr. Dishmon's vision center, had an expired license.  (*Id.* at 113-14.) Mr. Dishmon testified that he may have permitted Mr. Thurman to continue to dispense while Mr. Thurman attempted to have his license reinstated (*id.* at 120), but that Wal-Mart's regional compliance manager approved of this course of action (*id.* at 122).

Mr. Mason, Mr. Dishmon's district manager, testified that he learned of this licensing issue at Mr. Dishmon's vision center in late September 2006 and conducted an investigation, interviewing Mr. Dishmon, Mr. Thurman, and associates at the vision center and examining the vision center's schedules to determine whether unlicensed associates were working without a licensed optician present.  (Docket No. 32 Ex. D at 29, 62; Docket No. 32 Ex. F at 128-29.)  The investigation revealed discrepancies in the schedule indicating that Mr. Dishmon had scheduled licensed opticians primarily during the daytime hours, permitting unlicensed associates to dispense without a licensed optician present, particularly at night and on weekends.  (Docket No. 32 Ex. D at 62-63; Docket No. 32 Ex. F at 129-30.)  According to Mr. Young, the investigation also revealed that associates were "concerned about their jobs" and that Mr. Dishmon "was putting tremendous pressure on them to sell merchandise."  (Docket No. 32 Ex. F at 129.)

However, although Mr. Young characterized the results of the investigation in this manner, it was Mr. Mason, rather than Mr. Young, who actually conducted the investigation and the interviews. (*Id.*) Moreover, Mr. Mason's deposition testimony paints a markedly different picture of the interviews. According to Mr. Mason, Stella Crumby, one of the associates he interviewed, stated that she had not sold optical products without a licensed optician present. (Docket No. 32 Ex. D at 64.) Dann Dunham,[6] another associate, stated that "the expectation" was that unlicensed associates would dispense without a licensed optician present, but he refused to identify who had instructed him to do so. (*Id.* at 65-66.) Whitney Bible, another associate, told Mr. Mason that "there was a tremendous amount of pressure exerted on the associates to produce sales" and that she had dispensed without a licensed optician present, but, once again, she refused to identify the individual who exerted this pressure or authorized unlicensed associates to dispense. (*Id.* at 75-76.) Likewise, Mr. Thurman stated that he believed that unlicensed associates were dispensing without a licensed optician present, particularly at night and on the weekends, but he too refused to identify the person who had authorized this. (*Id.* at 70-71.) Finally, Toni Lane, a licensed optician, stated that she generally worked daytime shifts and that unlicensed associates were expected to "get sales no matter what," even when a licensed optician was not present, although she, like her colleagues, refused to identify the individual who had given an express instruction to this effect. (*Id.* at 73-74.)

According to Mr. Dishmon, Wal-Mart management, including Mr. Young, Mr. Mason, and Mr. Mason's predecessor, Ms. Creel, knew that unlicensed associates at various Wal-Mart

_____

[6]In various of the briefs and deposition transcripts, this individual is referred to as "Dan Dunn." His affidavit, however, identifies him as "Dann Dunham." (Docket No. 36, Dunham Aff.)

locations were dispensing without a licensed optician present and, in fact, encouraged such activity, well before Mr. Mason conducted his investigation of Mr. Dishmon's vision center. Mr. Dishmon asserts that he had conversations with Ms. Creel regarding not only the fact that unlicensed associates at a number of Wal-Mart locations were dispensing without a licensed optician present, but also that this practice violated state law. (Docket No. 36, Dishmon Aff. ¶¶ 1-2.) However, according to Mr. Dishmon, it was Ms. Creel's "big idea" to permit unlicensed associates to dispense without a licensed optician present and to have those associates ring up any such sales the following day, when a licensed optician was present. (Docket No. 32 Ex. C at 66.) Mr. Dishmon testified that, though he told Ms. Creel that he did not believe this was "right" (*id.* at 60), Ms. Creel nevertheless directly instructed his associates to dispense without a licensed optician present (*id.* at 87).[7] Although he informed his associates that this practice was illegal and that he would not require them to follow Ms. Creel's directions, Mr. Dishmon testified that his associates subsequently dispensed without a licensed optician present because they had been instructed to do so by "upper management." (*Id.* at 112-13.) Mr. Dishmon has submitted affidavits from Mr. Dunham and Ms. Bible, two of the associates interviewed by Mr. Mason during his investigation, corroborating this explanation and stating that Ms. Creel personally instructed them that they "could and should sell and dispense optical products when a licensed optician was not present," but that they should "wait until the next day to ring up the sale in the register when the licensed optician was present." (Docket No. 36, Bible Aff. ¶¶ 3-4; Docket No. 36, Dunham Aff. ¶¶ 3-4.)

---

[7]Ms. Creel denies that she ever instructed any associates to dispense without a licensed optician present or that she gave Mr. Dishmon permission to do so. (Docket No. 32 Ex. B at 23-24, Ex. 1.)

13

Mr. Dishmon also asserts that Mr. Young and Mr. Mason were aware of and condoned the practice of having unlicensed associates dispense without a licensed optician present. On one occasion, Mr. Dishmon was present when Mr. Young received a telephone call from an unlicensed associate, and he overheard Mr. Young instruct the associate to dispense without a licensed optician present, despite the fact that Mr. Dishmon himself had advised Mr. Young that this would be unlawful. (Docket No. 36, Dishmon Aff. ¶ 7.) Mr. Dishmon also alleges that, after Mr. Mason succeeded Ms. Creel, Mr. Dishmon had a conversation with Mr. Mason in which he informed Mr. Mason that unlicensed associates at his vision center occasionally dispensed without a licensed optician present and that Ms. Creel was aware of and had, in fact, authorized this practice, despite knowing it was illegal. (*Id.* ¶ 4.) Mr. Dishmon asserts that he asked Mr. Mason if he should stop this practice, and Mr. Mason reportedly replied that he would not tell Mr. Dishmon how to run his business, and that "we were on a 'don't ask, don't tell' policy."[8] (*Id.*)

_____

[8]Wal-Mart argues that Mr. Dishmon's characterization of the conversation is inaccurate and that this portion of his affidavit should be stricken. (Docket No. 39 at 4-5.) Mr. Dishmon's affidavit states:

> After Robert Mason became District Manager, I had a personal conversation with him in which I mentioned that from time to time at my store location non-licensed employees dispensed and sold optical products when a licensed optician was not present. I told him that the former District Manager, Rachel Creel, was aware of this practice, that she knew it was unlawful, and that she had actually authorized and directed two of my non-licensed employees to sell and dispense optical products when a licensed optician was not present. I asked him if he wanted me to cease this practice, and he indicated he was not going to "tell me how to run my business," and to continue operations as is until further notice. He indicated we were on a "don't ask, don't tell" policy.

(Docket No. 36, Dishmon Aff. ¶ 4.) Wal-Mart points to a subsequent conversation between Mr. Dishmon and Mr. Mason, which Mr. Dishmon recorded, and in which Mr. Mason claimed that, in the previous conversation, he had merely approved of permitting unlicensed associates to

14

Further, Mr. Dishmon asserts that Wal-Mart management, including Mr. Mason and Mr. Young, were aware that unlicensed associates at various Wal-Mart locations in Tennessee were dispensing without a licensed optician present. In a September 22, 2006 email announcing her resignation, Brandy Miller, a licensed optician at another Wal-Mart location, stated that she was leaving the company, in part, because she had been

> told by higher management that I do not have to run legal with licensed opticians from open to close. I believe this is an integrity issue. I am against breaking a state law that has provided my profession to be a profession and not just another job. It IS ILLEGAL to do anything in a Vision Center without a licensed present

_____

close the vision center at night, but not to dispense in the absence of a licensed optician:

Mr. Dishmon:    Well, I want to talk about this first if that's alright. Well, one thing I have a problem with was on our first meeting – yeah, on that first meeting, I told you that I was running without a license all the time and you told me that you're not going to tell me how to run my business.

Mr. Mason:      Okay. Let's qualify what you just said. Okay? There may be times late in the day when we have a licensed optician go home and a nonlicensed might be the one closing. That is a totally different issue than dispensing without a license.

Mr. Dishmon:    True.

Mr. Mason:      Okay. So let's not confuse the two. You were open and you said, "There are times when you don't have a license on duty." Okay? I let you manage your business. You put the licenses in there whenever you have to. Okay? We're clear on that one, right?

(Docket No. 39 Ex. B ¶ 5.) Wal-Mart argues that, as the characterization of the first conversation contained in Mr. Dishmon's affidavit is contrary to Mr. Mason's characterization of that conversation in the recorded second conversation, it cannot form the basis of a factual dispute and should be stricken. However, even if the recording of the second conversation is accurate, and there is no reason to believe it is not, there is also no reason to believe that Mr. Mason's post-facto characterization of the first conversation is either objectively accurate or relatively more accurate than Mr. Dishmon's characterization of that conversation. Therefore, this portion of Mr. Dishmon's affidavit will not be stricken, but rather will be considered in light of all of the other facts, including the recorded second conversation.

15

and it is happening daily within this company.  I will not violate my beliefs to hit
this company's payroll expectations.

(Docket No. 36, Dishmon Aff. Ex.)[9]  Ms. Murray also testified that, on several occasions prior to

her resignation, she had conversations with Wal-Mart management regarding this issue.

Specifically, she testified that Ms. Creel and Mr. Mason asked her to reduce her payroll by

cutting the working hours of licensed opticians.  (Docket No. 36, Murray Aff. ¶ 5.)  Additionally,

she learned through personal conversations with managers and employees at other Wal-Mart

locations that unlicensed associates were permitted to dispense, informed Ms. Creel and Mr.

Mason of this fact, and further informed them that she was unwilling to do that at her own vision

center.  (*Id.* ¶ 6.)  Mr. Dishmon complains that he was terminated following Ms. Murray's

resignation because Wal-Mart was in need of a "scapegoat."  (Docket No. 36 at 7.)  He

additionally asserts that he was replaced by Nicole Bowles, despite the fact that Ms. Bowles, like

Mr. Dishmon, acted at Ms. Creel's direction and permitted unlicensed associates to dispense

---

[9]In his affidavit, Mr. Dishmon characterized this email as "[telling] these persons in
upper management that Vision Center locations in Tennessee were running illegally by allowing
unlicensed employees to sell and dispense optical products when a licensed optician was not
present."  (Docket No. 36, Dishmon Aff. ¶ 6.)  Wal-Mart moves to strike this paragraph because
it is inconsistent with the actual content of the email, arguing that the email refers only to vision
centers being open without a licensed optician present, as distinguished from an unlicensed
associate actually dispensing optical products.  (Docket No. 39 at 3-4; Docket No. 40 at 9 n.1.)
To the extent that Mr. Dishmon's affidavit characterizes the content of the email, it will be
disregarded, as the email speaks for itself.

16

without a licensed optician present when she was working at another Wal-Mart location.[10] (Docket No. 36, Dishmon Aff. ¶ 10.)

In light of all of these facts and considering the parties' substantially conflicting interpretations, Mr. Dishmon has established that a genuine issue of material fact exists as to whether his communications with the Board were either the exclusive cause, or a substantial reason for, his termination. Mr. Dishmon was terminated mere days after the telephone call that he and Mr. Partain made to the Board. Moreover, he has demonstrated that Wal-Mart management knew weeks, if not months, prior to his termination that unlicensed associates at various Wal-Mart locations were dispensing without licensed opticians present, and yet it was only after the telephone call that Mr. Dishmon was terminated. Although Wal-Mart strenuously asserts that Mr. Dishmon was under investigation well before the telephone call to the Board and was terminated because he permitted unlicensed associates to dispense, conduct for which he had previously been disciplined, a reasonable jury could nevertheless conclude that Mr. Dishmon was terminated solely as a result of his refusal to remain silent. This is particularly so in light of Mr. Dishmon's allegation, corroborated by several witnesses, that the authorization to permit unlicensed associates to dispense originally came from Ms. Creel and was known to other

_____

[10]Drawing on case law from the Title VII context, Wal-Mart argues that Ms. Bowles may not be compared to Mr. Dishmon as she was not "similarly situated," in that she had not been previously disciplined for permitting unlicensed associates to dispense without a licensed optician present and in that there was no conclusive evidence of such conduct on her part. (Docket No. 40 at 7-8.) Unlike the plaintiffs in the Title VII cases on which Wal-Mart relies, however, Mr. Dishmon need not demonstrate that a similarly situated individual was treated differently in order to establish a claim of retaliatory discharge. Therefore, the court will not disregard evidence regarding Wal-Mart's treatment of Ms. Bowles, to the extent that such evidence sheds light on the reason for Mr. Dishmon's termination, although it does note that the differences between Ms. Bowles and Mr. Dishmon mitigate the persuasive power of this evidence somewhat.

17

members of Wal-Mart management. Moreover, although Wal-Mart argues that Ms. Creel's denial that she authorized unlicensed associates to dispense should be credited, noting that Mr. Dishmon's vision center had adequate licensed staff to cover all of the vision center's operating hours and that none of the individuals interviewed by Mr. Mason named Ms. Creel as the source of the authorization for unlicensed associates to dispense,[11] it is not the court's role, at this juncture, to weigh the evidence and to credit or discredit conflicting testimony.

The case of *Hovatter v. Sara Lee Corp.*, No. 2:07-CV-94, 2008 WL 4846316 (E.D. Tenn. Nov. 5, 2008), on which Wal-Mart relies, is not persuasive. In that case, the plaintiff made several complaints to her superiors about the lack of restroom facilities at the store where she was employed and was directed to use a restroom in an adjacent building. Unhappy with this arrangement, the plaintiff began urinating in a bucket in the store's office and was terminated for this conduct. She brought retaliatory discharge claims, which were dismissed on summary judgment on several grounds. Notably, the court found that, during her deposition, the plaintiff admitted that she was terminated "for the bucket" and held that this acknowledgment precluded her retaliatory discharge claim. Here, by contrast, although Mr. Dishmon has acknowledged certain conduct on his own part and that Wal-Mart has proffered that conduct as a reason for his termination, he disputes, both in his deposition and in his briefs, that this conduct actually was the cause of his termination. (Docket No. 32, Dishmon Aff. at 60, 73-74; Docket No. 36 at 6-7.) His testimony, in conjunction with the other evidence upon which he relies, presents a genuine issue of fact on the question of causation.

---

[11]Moreover, the court notes that, although the individuals interviewed by Mr. Mason did not identify Ms. Creel, neither did they designate Mr. Dishmon as the source of that direction.

In sum, a reasonable jury could conclude that the exclusive cause of Mr. Dishmon's termination was his refusal to remain silent with respect to Wal-Mart's activities, establishing the causation element of his statutory retaliatory discharge claim. Further, as the common law standard for establishing the causation element is lower than the statutory standard, Mr. Dishmon also has established the causation element of that claim as well.

C.      *Pretext*

Finally, Wal-Mart argues that, even if Mr. Dishmon has established a *prima facie* case of retaliatory discharge, it has presented a legitimate reason for Mr. Dishmon's termination and Mr. Dishmon has not demonstrated that this reason was pretextual. (Docket No. 30 at 17-20.) However, for essentially the same reasons stated with respect to causation, Mr. Dishmon has established a genuine issue of material fact as to whether the legitimate reason proffered by Wal-Mart for his termination was, in fact, pretextual. Specifically, the facts that Mr. Dishmon's termination followed so closely on the heels of his conversation with the Board, that numerous witnesses testified or affirmed that Ms. Creel directed unlicensed associates to dispense without licensed opticians present, and that Wal-Mart management was aware for weeks that this was taking place at a number of Wal-Mart locations, establish, at the very least, a genuine issue of material fact as to whether the reason proffered by Wal-Mart for Mr. Dishmon's termination—that he permitted unlicensed associates to dispense without a licensed optician present in violation of Tennessee law—was, in fact, pretextual.

Wal-Mart attempts to rely on the "honest belief" rule, which provides that, "as long as an employer has an honest belief in its proffered reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001).

19

An employer has an honest belief in the proffered reason if it reasonably relied on the particularized facts available to it at the time of its decision. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). However, the honest belief rule does not entitle Wal-Mart to summary judgment in this case. Although Mr. Dishmon acknowledged that associates in his vision center dispensed without a licensed optician present, the evidence uncovered by Mr. Mason during his investigation did not provide a reasonable basis for Mr. Dishmon's termination. First, Mr. Mason and Mr. Young concluded, on the basis of Mr. Mason's interviews with associates, that it was Mr. Dishmon who had pushed his associates to "get sales no matter what" and authorized them to dispense without a licensed optician present, despite the fact that none of the associates interviewed actually identified Mr. Dishmon as the source of that direction. Moreover, although Mr. Dishmon informed Mr. Mason that it was, in fact, Ms. Creel who had given that direction, Wal-Mart credited Ms. Creel's denial without considering the substantial personal interest that might lead her to be less than truthful in responding to Mr. Mason's inquiries, or the inhibition that associates may have felt about naming her in interviews with Mr. Mason. Additionally, although Wal-Mart again argues that there was no reason for unlicensed associates at Mr. Dishmon's vision center to dispense as he had sufficient licensed staff to cover all of the vision center's operating hours, the fact is that Wal-Mart had before it an allegation that Ms. Creel condoned and, indeed, authorized this practice, and failed to investigate or even consider the ramifications of that allegation. Finally, Wal-Mart's "honest belief" argument is undermined by the fact that Wal-Mart had evidence of similar conduct at other vision centers that were not managed by Mr. Dishmon but, presumably, were under the auspices of the same managers who oversaw Mr. Dishmon's vision center.

20

For all of these reasons, Mr. Dishmon has established that a genuine issue of material fact exists as to whether the reason proffered by Wal-Mart for his termination is pretextual, and, therefore, summary judgment for Wal-Mart is not warranted.

## **CONCLUSION**

For the reasons discussed herein, the Defendant's Motion for Summary Judgment will be denied and the Defendant's Motion to Strike Portions of Plaintiff's Affidavit will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

Case 2:07-cv-00079   Document 45   Filed 02/17/09   Page 21 of 21 PageID #: 456